John W. Beeman and Myra M. Beeman v. Commissioner.
Beeman v. Commissioner
Docket No. 75841.
United States Tax Court
T.C. Memo 1961-86; 1961 Tax Ct. Memo LEXIS 265; 20 T.C.M. (CCH) 387; T.C.M. (RIA) 61086; March 28, 1961
William Nile Jaccard, Esq., Security Bank Bldg., Glendale, Calif., for the petitioners. Harold W. Vestermark, Esq., for the respondent. MURDOCK
Memorandum Opinion MURDOCK, Judge: The Commissioner determined a deficiency of $7,684.12 in the income tax of the petitioners for 1953. He disallowed a deduction of $15,793.84 taken as a bad debt with the explanation that that amount "of worthless 'advances' to B-R Cleaners, Inc., is not allowable as an ordinary loss deduction" but "the capital loss sustained therefrom is allowed subject to the limitation provided in section 117(d)." He considered $10,000 of that amount as a long-term capital loss (investment in the business) and the balance as a short-term capital loss (nonbusiness bad debt - loans). This action of the *266 Commissioner is assigned as error. The parties have stipulated the facts upon which the case is to be decided and the stipulation is adopted as the findings of fact. The petitioners are husband and wife. They filed a joint income tax return for 1953 with the district director of internal revenue at Los Angeles, California. John is a physician and surgeon with offices located in Torrance, California, where he entered practice in 1937. His principal occupation and source of income since then has been the practice of medicine. He formed a partnership in 1942 with two other doctors, one of whom dropped out in 1947, and the other, Clifford E. Easley, has continued in partnership with John. The Medical Center of Torrance was organized as an association on February 1, 1955, and to it John and Easley transferred certain assets of their medical practice in exchange for the issuance of note certificates of no stated value. That organization was fully equipped with complete laboratory and X-ray facilities and staffed with technicians, service men and several doctors in addition to John and Easley. John's medical practice income from the Medical Center during the years 1949 through 1953 ranged *267 from a low of $42,931.89 in 1949 to a high of $57,976.47 in 1952 and in 1953 was in excess of $50,000 John, together with William H. Rojo and William N. Jaccard, formed a corporation on May 28, 1951, known as the B-R Cleaners, Inc., for the purpose of engaging in the dry-cleaning business in Torrance. John was president, treasurer and director. Rojo was vice president, director and manager. Jaccard was attorney for the corporation and served as secretary and director. The only capital stock of B-R was 20 shares of $10 par value capital stock issued for cash, 9 shares to John, 9 to Rojo and 2 to Jaccard. B-R purchased the Valet Cleaners in 1951 from Roy W. Peterson for $27,546.20 payable $5,046.20 in cash, $3,956.67 in outstanding obligations assumed by B-R and the balance in monthly installments of $300 each beginning March 1, 1952. John loaned B-R $6,000 to be used in making the down payment and to provide initial working capital. The stockholders assumed no liabilities. The above transaction was contingent upon the sellers and the purchasers making a satisfactory lease with an option to purchase. Peterson agreed not to compete for a period of 10 years within a radius of 15 miles. *268 B-R was a failure from its inception. Rojo was relieved of his duties as manager, vice president and director on March 24, 1952, and was replaced by Myra as vice president, director and manager. The following loans to be used as working capital were made by John to B-R during the period June 15, 1951, through October 14, 1953: Date
Amount
6/15/51
$ 6,000.00 (original
loan)
6/29/51
1,000.00
8/ 7/51
600.00
8/17/51
200.00
8/21/51
800.00
10/18/51
800.00
11/19/51
1,300.00
12/17/51
500.00
1/ 7/52
600.00
1/28/52
2,000.00
2/ 2/52
500.00
2/ 2/52
1,000.00
3/10/52
1,500.00
3/28/52
800.00
4/30/52
2,000.00
6/16/52
700.00
9/10/52
700.00
11/ 5/52
800.00
12/ 9/52
1,000.00
1/31/53
500.00
2/ 6/53
800.00
2/18/53
500.00
3/25/53
500.00
5/20/53
500.00
6/ 3/53
208.84
6/25/53
(15.00) *
7/ 6/53
500.00
10/14/53
1,000.00
$27,293.84
The original $6,000 loan was set up on the books of B-R as a note payable. The records of B-R do not show any agreement as to interest payments to John on the above. B-R issued and delivered to John its promissory note for $19,600 on April 30, 1952, and its promissory note *269 for $5,500 on December 31, 1952, each to bear interest at 5 percent. The petitioners reported no interest income on their returns for the years 1949 through 1953, but on those returns claimed deductions for interest payments of $615.43, $277.04, $225.74, $1,574.43 and $3,151.94. B-R claimed interest deductions for the years 1951 through 1953 of $518.92, $1,075.58 and $526.59. B-R sold all or substantially all of its assets on October 19, 1953, to Roy W. and Ruth H. Peterson. The purchasers executed their promissory note in the amount of $11,000 secured by a chattel mortgage to B-R, which was then endorsed to John. John received an additional $500 from Peterson, making the aggregate amount received from the liquidation of B-R $11,500. B-R was dissolved on December 31, 1953. B-R on its returns showed an operating loss and deficit of $7,834.63 for 1951, $7,019.37 operating loss for 1952, $1,962.98 operating loss for 1953 and a total deficit at that time of $16,816.98. John made personal loans of $400 in 1939, $2,500 in 1946 and $513 in 1950, all of which were repaid. John and Myra purchased unimproved property in Torrance in 1941 and constructed rental units thereon. They transferred *270 title to this property on January 31, 1955, to J.M.M. Corporation, of which they were the sole stockholders. John and John Shidler entered into a joint venture on February 18, 1947, for the purpose of operating improved rental property in the Torrance neighborhood. This venture at the close of that year had assets of $29,975.52 with an encumbrance of $16,376.26, and the capital account of John was $10,053.54. John's share of the income of the venture for that year was $53.54. John and Easley, as partners, constructed a multiple rental property in Torrance in 1948, which was then known as the Medical Center of Torrance. The construction cost was $81,377.59. The title to this property was transferred on September 15, 1955, to the Medical Center of Torrance Building. This property was used essentially for the medical practice of John and Easley as well as for rental purposes. John purchased unimproved property on January 24, 1951, for $2,700 for the purpose of developing a subdivision and sold the property for $6,500 on May 5, 1952. John and Easley purchased improved rental property in Harbor City, California, in January 1953 for $12,215.14 and transferred title to this property *271 in September 1954 to the Medical Center of Torrance, a corporation of which John and Easley were the only shareholders. The corporation sold the property on May 28, 1956, for $14,000. John and Easley purchased unimproved property in Torrance in March 1953 for $18,601.75 for possible use as a site of a proposed hospital and clinic, and rental property. They formed a corporation known as the Medical Center of Torrance Building on September 10, 1954, and transferred a substantial portion of their joint assets, including the site just described, to it in exchange for stocks and bonds of the corporation at the stated value of $127,600. Myra and Nell Marquis entered into a partnership on April 3, 1947, to manufacture reversible blouses. This partnership was dissolved in June of that year for financial reasons. Myra on a separate return for that year in which she described her occupation as "Housewife" reported a loss from the blouse business of $1,436.44. The petitioners contend that John was engaged in "the business of lending money to, or promoting, organizing and financing business enterprises or organizations". Counsel for the petitioners in his briefs goes beyond the stipulated *272 facts and makes and relies upon statements which are not a part of the stipulation of facts and which for that reason cannot be considered in the decision of this case regardless of whether or not they are true or material. The stipulation shows that John made three small loans to individuals, one in 1939, another in 1946, and another in 1950. Obviously they would not show that he was in the business of lending money. The stipulation does not show that either he or Myra ever loaned any money to any business enterprise or organization with which he was connected except B-R. The only conclusion that can be reached from the stipulation is that John was not in the business of lending money to business enterprises or organizations. John and Easley entered into several transactions connected in one way or another with the practice of medicine, John's principal occupation, which had no connection whatsoever with the loans here in question. John also entered into several other transactions which were not connected with the practice of medicine, but they were few and far between and did not constitute any business of which his B-R transactions were a part. These included the purchase in 1951 *273 and improvement of a lot which was later transferred to a wholly owned corporation, a joint venture in improved rental property in 1947 and the purchase of an unimproved property in 1951. He and Easley purchased in 1953 improved rental property which might have had some connection with the practice of medicine. All of John's transactions mentioned in the stipulation, whether taken collectively or separately, fail to show that he was engaged in any business of which his advances to B-R were a part. Furthermore, the cleaning business was the business of B-R and not that of any of its stockholders or officers. The Commissioner contends, with reason, that B-R was inadequately capitalized at $200 and the major portion of the money which B-R received from John was needed as working capital and was in reality a capital investment by him in that company rather than loans to it. However, it is immaterial whether this money represented loans or capital investments because, if loans, they clearly resulted in nonbusiness bad debts and the treatment under the Code would be the same whether the losses were capital losses or nonbusiness bad debt losses. The Commissioner did not err in determining *274 the deficiency. Decision will be entered for the respondent. Footnotes
*. A repayment to Myra.↩